## DEAL et al. v. MORROW.

### No. 13779.

United States Court of Appeals
Fifth Circuit.

June 30, 1952.

Rehearing Denied Aug. 4, 1952.

822

Helen Goodner, Sp. Asst. to Atty. Gen., Ellis N. Slack, Acting Asst. Atty. Gen., for appellants.

Forney Johnston, Paul Johnston, Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and RUSSELL and STRUM, Circuit Judges.

HUTCHESON, Chief Judge.

The suit was for the recovery of taxes overpaid for the year 1943, as short term[1] capital gains on the sale of 1133 shares of stock in the Goslin Mfg. Co.

The claim was: that these shares were capital assets which when sold had been held for more than six months and the gains from their sale were taxable as long term capital gains,[2] that is only 50 percent of them were to be taken into account; but that the commissioner, erroneously determining that the shares had been held for not more than six months, taxed them as short term capital gains and required taxpayer to pay on 100 percent thereof.

The defense was that the shares had not been held for more than six months and the commissioner's determination was correct in fact and in law.

The case was tried to the court without a jury on testimony[3] which came in without

1. "§ 117 I. R. C., Capital gains and losses
   "(a) Definitions. As used in this chapter—
   "(1) Capital assets. The term 'capital assets' means property held by the taxpayer * * * but does not include * * *.
   "(2) Short-term capital gain. The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *." 26 U.S.C. § 117(a) (1, 2).

2. "§ 117 I. R. C. Capital gains and losses
   "(a) Definitions. As used in this chapter—
   *    *    *    *    *    *
   "(4) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;
   *    *    *    *    *    *
   "(b) Percentage taken into account. In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:
   "100 per centum if the capital asset has been held for not more than 6 months;
   "50 per centum if the capital asset has been held for more than 6 months. * * *" 26 U.S.C. 1946 ed. § 117(a) (4) (b).

3. During 1943 and for many years prior thereto the taxpayer was president of the Company. Prior to 1942 most of the stock and physical assets of the Company had been pledged as security for various debts of the Company and in 1942 the stock was held as collateral by the First National Bank of Birmingham, the principal creditor, for itself and other creditors.

   In the summer of 1942 the Company obtained war orders and the prospects of its making substantial profits on current operations looked bright. The Bank did not desire to undertake or participate in the ownership or control of an operating company but it did desire to realize something on the old indebtedness while the prospects of realization existed.

   In Sept., 1942, the Bank sold at public auction all of the stock pledged with it as security, and this stock, which included the 1133 shares in issue here, was purchased by the taxpayer and one Lindley C. Morton at a price of $1.58 per share. All the other outstanding shares were also acquired by them so that by the end of Sept., 1942, taxpayer and Morton each owned one-half, or 1585 of the total 3170 shares of the Company's stock, although the shares were all held in taxpayer's name.

   In October, 1942, the Bank as trustee for the old creditors took title to the Company's land, plants, machinery, and plant equipment in return for a credit of $234,000 on the Company's long standing debts. It permitted the Company to retain possession of and to use the plants until sold in exchange for an annual rental equal to 13 percent of the figure at which the properties were appraised in 1939 plus an amount equal to 4 per cent on gross sale of more than $2,000,000 and not more than $3,000,000, with 1 per cent additional for each successive $1,000,000 of gross sales or fraction thereof. This was a substantial rental.

resulting in the payment of the Company's earnings to the creditors in the form of rent, rather than as payments on the debts or as income and excess profits taxes.

During the fall of 1942 Morton and Cabaniss, of the law firm of Cabaniss & Johnston, acting for the taxpayer, and the Company, negotiated with the Commercial Credit Company (hereafter called Commercial) for the purchase by it of all the capital stock of the Company. Commercial was interested in the matter because it looked as though the Company would make current profits and because of the parties' understanding that in a merger Commercial's invested capital would protect the Company's war earnings from excess profits taxes to which it was exposed by reason of having no base period earnings credit and a nominal invested capital following loss of its plants to creditors. However, Commercial was unwilling to pay a price for the stock which was unrelated to the Company's earnings for the ensuing year. The terms of sale were finally agreed upon during the week preceding Nov. 30, 1942. Taxpayer did not participate in the negotiations but was aware of the terms generally.

On Nov. 30, 1942, taxpayer signed the letter prepared by his counsel embodying the arrangement previously agreed upon as the effective vehicle of means for achieving the desired end. The letter addressed to Cabaniss stated:

"I am willing that you should have the use and benefit of my interest in the common stock of Goslin-Birmingham Manufacturing Company, Inc., coupled with an option to purchase the stock on the following terms:

"(1) This discharges any and all obligations to your firm for legal services in the various matters affecting my relations to or interest in that Company.

"(2) You are, in addition, to pay me $2,000.00, which is, however, subject to credit as hereinafter stated.

"(3) I hereby lend to you the shares to which I am entitled, viz: 1585 shares, with the full right to deal with them as you see fit, without accountability on part of any person dealing with you as to the stock, also the option to purchase the shares.

"(4) You are to return the shares or a like number of said shares to me together with any rights, dividends or distribution, liquidating or otherwise, which may have been declared or issued with respect to said shares on or before Dec. 31, 1943, unless prior to that date you elect to purchase under the option.

"(5) You shall have the option to purchase the stock and discharge your obligation to return the shares and for any dividends or distribution thereon, on the following terms, viz.:

"You are to account to me for four-fifths of any net price or consideration which you may have received or contracted to receive. If you shall not have been paid in cash or other property you shall transfer to me an undivided four-fifths interest in any contract or right to receive consideration for any sale or commitment by you for sale of the stock; in which event I shall thereupon assume a four-fifths share in any obligation you may have assumed in connection with the sale or other realization on the shares, but in such case I shall have the right in lieu of such assumption to make a fair cash allowance for such obligation or liability and if not agreed upon to have the amount arbitrated.

"The cash consideration of $2,000.00 paid by you is to be credited on the option price, if exercised. If not exercised, to be retained by me."

Concurrent with the letter taxpayer endorsed in blank certificates covering all of the 3170 shares of Company stock standing in his name, of which 1585 shares were owned by him and 1585 shares were owned by Morton, and turned them over to Cabaniss.

On the following day, Dec. 1, 1942, Cabaniss and Morton joined in a written agreement with Commercial, under which they agreed to sell, and Commercial to buy, the 3170 shares of the Company's stock for a consideration of $10,000 payable to Kidder Peabody & Co. as a commission on the sale, and an amount equal to the net income of the Company, as defined in the agreement, for a twelve month period commencing Dec. 1, 1942, and ending Nov. 30, 1943, or $500,000, whichever was the lesser amount. As a part of this agreement Cabaniss and Morton warranted inter alia that they were "the sole and exclusive owners or holders of said 3170 shares of stock" and were "fully and unrestrictedly empowered and entitled to sell and transfer good title to the same to Buyer free and clear of all liens, encumbrances of claims". Cabaniss and Morton also gave a warranty and guaranty of the balance sheet of the Company as of Nov. 30, 1942, and a warranty of the title of the physical assets (land, plants, machinery and equipment) which Commercial purchased from the Bank as trustee for the creditors. The balance sheet so guaranteed was certified to by the taxpayer as being correct.

conflict or dispute. It consisted mainly of the testimony of plaintiff's counsel who had planned, confected, and carried out the arrangements for plaintiff's benefit with plaintiff's knowledge and acquiescence, of testimony by plaintiff, and of documents prepared or procured by plaintiff's counsel.

There were findings of fact and a judgment in favor of the taxpayer, and the defendants have appealed, presenting here one fundamental question for decision. This question is whether the taxpayer held the 1133 shares of stock involved in this case for more than six months and his gain on their sale is taxable as long term capital gain, as the district court held, or whether he held them less than six months and his gain is taxable in full, as the government contends.

The oral testimony of plaintiff and of Messrs. Cabaniss and Johnston, his counsel, dealt with, the preliminary purchase of the shares by taxpayer in September, 1942, the involved condition of the company of which taxpayer was, and had for ten years been, president, the enlistment by the creditor bank and the taxpayer of the efforts of one Morton to dispose of the property of the

Concurrently with the execution of these agreements, the certificates covering 3170 shares of stock which had been endorsed in blank by taxpayer were delivered to Commercial, which procured the issuance of new shares in its own name and substituted new directors for those serving prior to that time.

Prior to the execution of these agreements taxpayer had been advised by Cabaniss and Johnston that if he joined in the contract for the sale of his stock directly to Commercial he would have a holding period for the shares acquired in Sept., 1942, of less than six months and that all of his profit would be taxable, whereas if he was not involved in the liability under the contract, did not authorize the transaction as on his account, entered into the loan-option agreement, and everything went well, he would have a holding period of more than six months. The arrangement of not selling taxpayer's stock outright and giving Cabaniss an option was planned and confected by his attorneys for the purpose of having taxpayer's gain classified as long term and minimizing his income tax liability upon its sale.

The company actually realized a net income of about $800,000 (after renegotiation but before excess profits tax) for the 12 month period ending Nov. 30, 1943. On Dec. 20, 1943, Commercial transmitted to Cabaniss and Morton its check for $500,000, the letter stating that the payment was made prior to the certified auditors' report as to earnings for Jan. 1–Nov. 30, 1943, and prior to renegotiation with the Government for Jan. 1–Nov. 30, 1943 and that if the $500,000 was in excess of the amount ultimately due, the overpayment was to be repaid to Commercial in accordance with the contract.

On Dec. 23, 1943, Cabaniss wrote a letter to taxpayer reading as follows:

"Please be advised that I have exercised the option given me by the terms of your letter of Nov. 30, 1942, to purchase the shares of stock therein mentioned at and for the total sum of $250,-000.

"I have today accounted to you for $200,000 of said purchase price less the $2,000 paid by me for the option, or a net total of $198,000.

"I have prepared and enclose herewith for your signature an instrument acknowledging receipt by you of all sums for which I am obligated to account to you under the terms of said letter, and if you find the enclosed instrument satisfactory I would appreciate your signing same for my file."

On Dec. 23, 1943, taxpayer signed the enclosure. In it he acknowledged full payment by Cabaniss of all amounts due him under his letter of November 30, 1942; he released and discharged Cabaniss of any further liability with respect to the Company's stock; he acknowledged that he was fully advised of all commitments made by Cabaniss to Commercial and agreed that he was and would continue to be liable for four-fifths of any amount for which Cabaniss might thereafter be held liable to Commercial by virtue of these commitments; and he stated that the payment by Cabaniss did not affect or discharge his liability to account to Cabaniss for four-fifths of such liability.

On his return for 1943, the taxpayer treated the amount received by him on Dec. 23, 1943, as gain from the sale of a capital asset held for more than six months, and included only 50 per cent thereof in taxable income. The Commissioner determined that the stock had been held for less than six months and assessed a deficiency of $46,964.30 which was duly paid, with accrued interest thereon of $7,445.70, total $54,410.

company, the engineered sale to Commercial of the shares of stock which taxpayer and Morton held, including the plan and the instruments used in carrying it out, by which Cabaniss could come into the picture and the taxpayer would, through his coming in, obtain a long term gain.

The documentary evidence dealt with taxpayer's acquisition of the stock, the different documents and papers executed in making and carrying out the sale of the stock in the company to Commercial Credit Co., and with taxpayer's controversy with the commissioner and his claim for refund.

While there is a difference of opinion between counsel for the taxpayer and the appellants, as to the bearing and effect on the tax question of the agreements confected by counsel, one of the issues, directly joined between them, is the importance of the documents in giving a reality and substance to the plan by which what would otherwise have been a short term sale by taxpayer was, as he claims, converted into a long term sale.

The emphasis of the counsel for the taxpayer is on: the long and detailed agreements imposing obligations which were executed by Cabaniss and Morton to Commercial Credit; the claim that the avoidance of these obligations by taxpayer was one of the main inducements to him for proceeding as he did; and the further claim that while tax saving was of importance it was not the whole consideration moving to the taxpayer.

The emphasis of appellants is placed on the testimony of taxpayer, as follows:

"Well, altogether it helped me out a lot,—the transaction did."

"Q. How was that? A. Because if I had sold the thing outright there, I should have been taxed like you already taxed me."

"Q. Oh, I see. A. By not selling it outright, and by giving him an option on it I hoped to avoid the three months limitation, and make it over six months.

\* \* \* \* \* \*

"A. Well, I knew that it was going —I thought it was—I was hoping that it was going to be a fact that week that it was consummated. I didn't know anything about any detail except the stock part. I didn't know anything about the other. I have never seen the papers on the other. I don't know what they got on it.

\* \* \* \* \* \*

"Q. It was a very important point with you as to whether or not this should be treated as a short term or long term gain? A. That's right.

"Q. For tax purposes? A. That is correct.

"Q. And this was the arrangement that was worked out? A. That's right.

"Q. And you were, of course, at least hopeful that it would be classified as a long term gain? A. I couldn't see why it shouldn't."

The emphasis of the appellants further is: on the evidence that Morrow had been the president of the corporation for years, that he knew all about the company and its conditions; that the supposed onerous obligations imposed and assumed were not in fact onerous, nor so considered by the taxpayer; that, indeed, though under the contingencies provided for in the instruments, he was to be responsible for four-fifths of them, he did not know, and did not trouble himself to inquire what they were; that, in short, the whole deal in form and in fact was, from a business standpoint, purely synthetic and it was, therefore, without effect to convert into a long term sale what was in reality a short term sale made by Cabaniss as taxpayer's conduit or instrument for effecting it.

Here insisting that the findings are clearly erroneous and that the question must be answered as contended for by them, appellants urge upon us that the judgment may not stand.

In agreement with the appellants upon the question for decision, but joining issue with them upon their contention that it was incorrectly answered below, appellee, relying on the findings of the court and the record made below, insists that the findings may not be set aside as clearly erroneous and that the judgment must be affirmed.

We cannot agree with appellee's view. On the contrary, for the reasons hereafter stated, we are of the clear opinion: that the appellants have the right of it; that the question must be answered in accordance with their contentions; and that the judgment must be reversed with directions to enter judgment for defendants.

This is not, however, because we are in disagreement with the view vigorously asserted by appellee's counsel below and here, and impliedly approved by the district judge. This is that the admitted fact that, in making the arrangements in question, the minimization of appellee's taxes was a factor, cannot standing alone, serve to condemn them as ineffective taxwise.

In Alexander v. Commissioner, 5 Cir., 194 F.2d 921, at page 925, we have expressly affirmed our adherence to this view:

"In the reports of the Senate and House Committees on H.R. 4473, the fruitful source of error in the application of the Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 and Clifford cases is so carefully pointed out that a wayfarer, if he be but uninformed and not a deliberate strayer, may not continue to err in the way.

"This source has been and is the failure, and sometimes the refusal, of commissioner and Tax Court to recognize and give effect to the difference, on the one hand, between tax evasion, the use of pretenses and forbidden devices to lessen or defeat taxes, and, on the other, tax avoidance, the making of lawful, that is of bona fide and valid, dispositions and arrangements in respect to property and services, with the purpose and result of effecting legally permissible tax savings. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596."[4]

■ It is one thing, though, to recognize and properly apply a sound principle. It is quite another to run that same sound principle into the ground. It is one thing for a dog to have a tail. It is quite another for the tail to wag the dog. It is one thing to say that when a taxpayer has a choice of methods for accomplishing a business result, all of them real, genuine and *bona fide,* and one of them will minimize his taxes more than another, he can employ that one. It is quite another thing to say that a purely synthetic expedient, having no real function as to the taxpayer and the sale, and serving no genuine purpose as to him except to reduce his taxes, may not be condemned as ineffective for that purpose.

■ A consideration of the undisputed facts in this case leaves us in no doubt: that, his gaze too intensely fixed upon the wholly sound principle that a taxpayer may lawfully minimize his taxes, and thereby too foreshortened for the discerning view the circumstances of the case required, the district judge erred in concluding that the taxpayer held the property for six months, the gain was a long term gain. We think it plain that the district judge, misled by the false analogy of the short sale form adopted as the efficient means for, and the legal craftsmanship exhibited in, the confection and carrying out of the plan, mistook shadow for substance, appearance for reality, and accepted, without sufficient scrutiny, an arrangement which was without legal substance or effect taxwise.

It will serve no useful purpose to point out in detail wherein the evidence failed to measure up to the requirements for the successful use by plaintiff of the device employed. It will be sufficient to point out as one of the indicia of the lack of verity of the transaction that none of it was at arms length. Conceived and carried out as a family matter, with the actors and instruments in it plaintiff and his lawyers, persons having fiduciary relations with each other, their dealings were subject to the same scrutiny and required to measure up to the same standard not only of openness and candor but of reality as are required when members of a family deal with each other in a way to effect tax savings.

Another is that the short sale form adopted as the vehicle was wholly inappropriate here. Used and usable only where there is

---

4. Cf. Chisholm v. Commissioner, 2 Cir., 79 F.2d 14; Elbert v. Johnson, 2 Cir., 164 F.2d 421.

a supply of stock in the market place available to replace that borrowed for use in the short sale, it was incapable of genuine use here where all the stock was sold to Commercial, none of it was, or would be, available for purchase by Cabaniss, and it was impossible, and known to the parties when the transaction was entered into that it would be impossible, for Cabaniss to get the stock back and return it to taxpayer in the event he failed to exercise his so-called option.

Further, the claim that the escape by Morrow from the obligations imposed in the sale to Commercial was a factor in Morrow's decision to have the transaction take the form it did, falls flat, when it is considered that the taxpayer actually assumed four-fifths of the obligations. It falls even flatter when it is seen, as the evidence makes clear, that, situated as Morrow was with reference to the company, being substantially its *alter ego,* his fortune tied up in it, none of the promises made or assurances given by Cabaniss and assumed four-fifths by Morrow were, or could be, regarded by him as onerous. He testified that he did not even know or inquire what the obligations were, and thus he proved conclusively that, whatever synthetic value for appearances his supposed desire to escape from these obligations had, he really had no such desire, and escape from them was not a factor with him. The testimony of his counsel and of the taxpayer cannot, we think, be read and considered as a whole without reaching the conclusion that the primary, the moving, consideration for the confection of the elaborate plan was its very elaborateness wherewith to inject with an appearance of business substance what was in substance and in fact a tax saving device; and that the arrangements made and the instruments executed were not real but purely synthetic business structures.

Finally, differing with counsels' view of the bearing on the matter of Cabaniss' treatment of his gain, we are of the opinion that the fact that Cabaniss accounted for the sale as to his part of it as a short term sale, puts the cap stone on the whole structure of fact, proving beyond dispute: either that, if there was an option, it was exer-cised in December, 1942, when Cabaniss, with taxpayer's consent, sold and delivered the stock to Commercial and it was transferred to its name on the books; or, if, as it seems to us, what is called an option was really not one in fact but only in form, the sale was made in December, 1942, not by Cabaniss but by the taxpayer, Cabaniss acting for him as his conduit and agent.

The judgment for the taxpayer was wrong. It is reversed and the cause is remanded with directions to enter judgment for defendants.